RUTTLE v. FOSS.

1. CONTRACTS — IMPLIED — FINDINGS ON SPECIAL QUESTIONS — IN-CONSISTENT VERDICT.

In an action for the value of services rendered, special find-ings by the jury, that plaintiff was not to be paid in cash, stock, or property under any agreement, are not fatally in-consistent with a verdict for the value of services rendered under an alleged agreement for compensation in some un-defined manner.

2. SAME—SPECIAL QUESTIONS.

Both parties testifying to an express agreement as to com-pensation for a portion of the services rendered, and dis-agreeing as to its terms, it was error to permit the jury un-der a declaration for breach of an express contract to render a verdict on the theory of an implied contract to pay what such services were worth.

3. EVIDENCE—DAMAGES—VALUE.

To determine the value of services rendered by plaintiff, evi-dence of what other persons could be or had been hired for is incompetent.

4. DAMAGES — CONTRACTS — IMPLIED    CONTRACTS — QUANTUM MERUIT.

One employed under an agreement for some compensation to be taken care of by defendant thereafter, and determined by subsequent arrangement to the satisfaction of both parties, may recover the value of his services upon a refusal to per-form in accordance with the arrangement.

5. EVIDENCE—MATERIALITY.

In an action for services rendered by plaintiff to defendant, where the issues involved the terms of an express agreement between the parties and its alleged breach, testimony relat-ing to plaintiff's ownership of stock in a coal mine, the man-ner of its acquisition, his salary, and relating to the value of the mine with which his services were concerned was irrelevant.

6. APPEAL AND ERROR—BRIEF OF APPELLANT.

A compliance with Supreme Court Rule 40, requiring a state-ment of the errors relied on and questions involved, by appel-

lant in his brief, is not shown in a brief which contains general discussion preceding the errors discussed, without a separate statement.

7. SAME—RECORD.

Failure to reduce the testimony to narrative form and omit colloquies of court and counsel warrants the court in limiting the taxable costs to a reasonable amount.

Error to Bay; Sharpe, J., presiding. Submitted February 24, 1910. (Docket No. 31.) Decided April 1, 1910.

Assumpsit by Charles S. Ruttle against Edgar B. Foss for services rendered. A judgment for plaintiff is reviewed by defendant on writ of error. Reversed.

*M. L. Courtright* (*De Vere Hall*, of counsel), for appellant.

*Weadock & Duffy* (*T. F. Shepard*, of counsel), for appellee.

The facts in this case and those involved in *Ruttle* v. *Mining Co., post,* 150 (125 N. W. 787), are a history of relations existing between plaintiff and defendant. Like that case, this one is a suit to recover the value of the services of the plaintiff. The declaration contains a special count, and joined therewith are the common counts in assumpsit. The particulars of plaintiff's demand are:

"1902—June 15, to 1904—June 23.

"To personal services in and in connection with modifying and making changes in and amendments to leases, securing right of way for railroad, making contracts, and other work in procuring, constructing, developing the property afterwards and on, to wit, the 23d day of June, 1904, put into and are a part of the What Cheer Coal Mining Company's property, $5,000.

"1903—October 26, to 1905—July 17.

"To personal services in and in connection with secur-

ing leases, examining leases, getting them acknowledged, recording them, modifying and changing options, procuring leases for options and other services in connection with procurement of coal leases in Bay, Saginaw and Tuscola counties, covering an acreage of, to wit, 31,480 of an estimated value of over $150,000, $7,000.

"Interest on the above at 5 per cent. to date of judgment."

During the period covered by the demand plaintiff was acting as secretary of the Wenona Coal & Mining Company, and from 1903 drawing a salary from that company of $2,000 per annum. During a portion of the time he claims to have been employed by the What Cheer Coal Mining Company, viz., from July 23, 1904, to July 17, 1905, under circumstances which required that his services should be paid for by that company.

As to his arrangements with Mr. Foss, plaintiff testified:

"In the latter part of 1901, fore part of 1902, I was manager of the Wenona Coal & Mining Company. In May or in spring of 1902 I entered into the employment or arrangement with Mr. Foss, for getting leases, etc.

" Q. What was the arrangement you made with Mr. Foss?

"A. The arrangement was to take up the leases that are now owned by the What Cheer Coal Mining Company and make such changes and modifications in the leases as I could; that is, to reduce the advance royalty, and change the leases from a run of mine to a screened basis, etc., and to look after the drilling. These leases were mostly in Merritt township, Bay county, and Buena Vista township, Saginaw county, and were owned by Mr. Foss, and had been taken by him previous to this time. Previous to making this arrangement I had been working for the Wenona Coal & Mining Company, starting on April 16, 1901, previous to which time I had been working for the Grand Trunk.

" Q. Under what arrangement, if any, did you start to work on these leases, correcting and reforming the leases, and preparing this coal field for operation?

"A. The arrangement was practically this: That the leases were not satisfactory to Mr. Foss, and, the mines being idle, he asked me if I would take up the work of

modifying the leases, and he said he wanted the whole matter kept separate from the coal mining business, the expenses; that any expenses incurred would be paid by E. B. Foss & Co., and if I were successful in getting the changes made, I would be compensated for it, or taken care of, and paid for the work I did. * * * I had nothing to do with getting those leases, or anything in connection with them, previous to that time. I took up lease by lease with the different farmers, and talked the matter of advances over with them, and had the leases modified and changed according to our ideas; the advanced royalties in some instances being reduced from $3 to $2.50. I continued working on those leases, and worked in connection with that field up to the organization of the What Cheer Coal Mining Company, and continued on until I resigned my position. I looked after the drilling, purchased all supplies for the drills, practically for the railroad, including securing the right of way, made contracts for all work in connection with the grading and building of the buildings and railroad, together with contracts for boarding house and other buildings, and everything that was connected with the construction of the mine, and looked after all details, and of all the accounts. I got special rates on material to Munger station. I think it was by correspondence. * * *

"*Q.* Now, to digress a moment from the letters, you stated this forenoon that you had a talk when you began, some time in May, 1902, you had a talk with Mr. Foss about going to work and exploiting and organizing what is now known as the What Cheer coal field, and he told you to go to work, and you should be compensated for it. That is what you testified this forenoon?

"*A.* That was in 1902.

"*Q.* When did you next have a discussion with him as to what interest, or what you should have, or what pay, or how should you be compensated in connection with that field for services rendered? * * *

"*A.* January 28th is my recollection of it now; that we went to Detroit on the Pere Marquette, and talked the matter over there, and at that time Mr. Foss made a proposition that I was to have so much stock in the company.

"*Q.* Explain what the talk was or figured up or made out at that time.

"*A.* The talk was simply this: We were sitting in the

chair car going down to Detroit to see Mr. Carpenter. We had talked that matter over before in regard to arranging for track facilities, and so forth, and this trip to Detroit was to see Mr. Carpenter to talk the matter over, and Mr. Foss had an envelope, and we were sitting in the rear of the car, as I recollect, the left-hand side of the train, both sitting opposite each other in chairs, and he figured that this, his capital stock of $100,000, the leases were put in at so much—

"*Q.* For how much?

"*A.* Well, the figures were changed somewhat. The whole thing amounted to $100,000, out of which he had me down on the envelope $15,000, and later he had me down $10,000 in stock. At any rate—

"*Q.* Wait. In that same conversation was it on that envelope fixing you at $10,000, or was it at some later date?

"*A.* It was a later date.

"*Q.* It was not in that conversation?

"*A.* No.

"*Q.* Then you do not run them together? At that date you say he had you down—

"*A.* Mr. Foss showed on the envelope $15,000 worth of stock that I was to have in the company. The balance was made up of the leases and his proportion of the capital stock at $100,000.

"*Q.* What was the $15,000 of stock to you for?

"*A.* For my services from the time I started in to change the leases and work I had done and what I would do for the company after the time of the organization. * * * There was no further talk after January 28th until the organization of the company July 23d, or at the time of the signing of the articles of association. Prior to this talk of January 28, 1904, the changes and modifications in the leases had practically all been made. * * *

"*Q.* Dropping the What Cheer field and turning to Tuscola, town of Merritt, and the Saginaw field, did you have at any time any other or further arrangement with Mr. Foss in regard to services in coal leases and getting a coal field?

"*A.* Yes, sir; about November 1, 1903.

"*Q.* Tell what that conversation or arrangement between you and Mr. Foss was in regard to getting those coal leases?

"*A.* Simply this: That I was to look after the leases,

get all the leases that I could, have charge of the work, prospecting, etc., conduct all the details, and he was to furnish the money, and I was to have a quarter interest in all the leases."

On cross-examination he testified:

" *Q.* Down to January 28, 1904, we have gone over the things that you said you did when the second conversation took place, viz., the conversation on the train. It has passed from March 1, 1902, until January 28, 1904, nearly two years; and you say you were to be compensated for that work? Is that right?

" *A.* Yes, sir.

" *Q.* In what way?

" *A.* There was not any price stated.

" *Q.* In what way?

" *A.* That matter was not talked of at all.

" *Q.* Was there anything said as to whether it should be money, or what it should be?

" *A.* No, sir.

" *Q.* What words were used with reference to compensation?

" *A.* The words I said

" *Q.* State it again.

" *A.* That the expenses incurred would make an expense account to E. B. Foss, and were to be paid by E. B. Foss & Co., and if I was successful in getting the modifications made, I would be compensated.  *  *  * On May 24, 1905, I talked with Mr. Foss on the subject of compensation. I made no claim for compensation for work in the Tuscola, Saginaw, or East Merritt fields prior to this time.

"*Q.* On the 25th of May, 1905, when you had this conversation with Mr. Foss, as you claim, outside of your $2,000 contract for salary, there were three other contracts in existence: One beginning as early as 1902, terminating June 23, 1904, under which you claim $5,000; one beginning October 26, 1903, under which you claim $7,000; one against the What Cheer Company under which you claim from July 23, 1904, to the termination of your connection, $5,000. You claim those three contracts in force on the 25th of May, 1905, don't you?

"*A.* Yes; everything was in force at that time.

"*Q.* Just answer my questions.

"*A.* It was in force at that time.

"*Q.* And these are the ones you say there are no writings of any character to evidence, and there is no person who heard them other than you and Mr. Foss?

"*A.* That is right. Mr. Foss' conversation with me was always *sub rosa.*

"*Q.* Why, was he afraid of you?

"*A.* I don't know, but that is the way he did business. * * * On May 24, 1905, when Mr. Foss and I were on the train, he said he would carry out his agreement. I did not see him again in regard to it until some time in June, about the 15th. On this date he had to go to a bank directors' meeting, and we did not take it up. He is a very busy man. The next talk we had was on July 6th. His son came in the office, and said there was some trouble in the mill, and he went out. The next talk we had was at the end of the dock at his office, on the 12th of July. When Ed. Foss came in the office I do no think he had said that he would not carry out the arrangement. We had a talk on July 12th, and it was very plain, too.

"*Q.* State what demand you made of him on July 12th at the end of the dock.

"*A.* I demanded that he carry out his agreement with me or put the matter in writing, so that we would know where we were at.

"*Q.* What did he say?

"*A.* Well, he hesitated, and he offered to increase my pay, in the Wenona Coal Company by $500, and I told him it was not a question of salary at all; it was a question of his carrying out his agreement with me, and nothing more and nothing less. I made practically the same statement to him that I did on the train on May 24th."

Redirect:

"In the talk on the dock I claimed that I was entitled to a certain amount of stock when the What Cheer was organized, and he had promised to give it to me, and that I was entitled to a certain per cent. or .25 per cent. interest in the leases, which he had declined up to that time, or had not put in writing, and I told him when he would put it in writing I would continue on, but instead of doing that he offered me an increase in salary. I told him it was not a question of salary at all; it was a question of carrying out his agreement, and if that agreement was carried out, there would not have been any further trouble at all. There was nothing said in this talk about

his giving me stock in the What Cheer mine for services rendered up to the time it was organized. I asked him for the stock that belonged to me in the What Cheer Company, and he said he was not going—I don't just recall what his statement was in regard to that, but at any rate I did not get the stock. *   *   *

"In talking to Mr. Foss on the train I brought up the question of his carrying out his agreement with me, and in this conversation I told him that neither he nor I had any lease of life, and if he should die I might have some trouble in having my claims protected, and if I should die, what would my family get out of it. His reply was this: He says, 'Never mind, Mr. Ruttle, I will see that your family is taken care of.' I says, 'Mr. Foss, that is a duty which devolves upon myself, and if you intend to carry out your agreement with me, there can be no objection to your putting the arrangement in writing.' He says, 'Well, I will think it over, and we will fix that matter up when I get home.' The matter was never fixed."

The testimony of defendant is:

"In January and February of 1901 I found I had too much work to do; that I could not look after all my work properly and attend to the details. At this time I knew the plaintiff casually. I formed his acquaintance by his being Grand Trunk freight agent. I occasionally had business with the Grand Trunk. I found that having so much work that I had to give up part of my business or else get some one to take some of the details off my shoulders, and the thought came that I could probably get some man from the Ohio fields that would know something about the coal business. At this time I had other coal interests in what is known as the What Cheer field. It had not been developed, but had been tested. After testing the field, if it had not been tested for sinking a shaft, we would have to test to find the right place for the shaft. This was the status of the What Cheer field at the time I got in communication with plaintiff. The leases had all been acquired, and the field tested up. I called Mr. Ruttle up and said in substance, asking if he knew of some man from Ohio coal fields that I could employ, and he answered back asking if he would do. I can only give that in substance. I said, 'Come over, and we will talk it over.' He came over, and after one or two talks I hired him.

"*Q*. You may state what you said to him during these talks as to what he was to do under his employment.

"*A*. The talk with Mr. Ruttle was that he was to enter my employment, the employ of the Wenona Coal Company, and do whatever I might want him to do for the Wenona Coal Company, or for myself in coal interests in general; that he was to have a salary of $1,400 per year.

"*Q*. State what he said. Are you stating the agreement that was made now?

"*A*. Yes, the agreement was that—

"*Q*. How did you come to hit on the sum of $1,400.

"*A*. Mr. Ruttle, in answer to my inquiry, said that he was getting, as I recall, $90 per month, and railroad fares, and some street car fares and opera house tickets and other sources; he would get perhaps $10 more per month, making a salary of approximately $100 a month, or $1,200 per year, and as an inducement I gave him a couple of hundred dollars a year more than he was then getting. This salary was to be paid by the Wenona Coal Company. * * *

"*Q*. When did you first speak to him about your interest in the What Cheer field?

"*A*. At the time I hired him.

"*Q*. What did you tell him about your interest?

"*A*. I told him I had these leases, that the field had been tested up, and that I had not determined just what I would do with that field.

"*Q*. Had you then determined?

"*A*. No, sir; I had not. Mr. Ruttle was to look after the sales of the coal under my direction. I gave him the prices; that is, the minimum prices. At times the mine would require supplies, and they would telephone or send in their requests, and Mr. Ruttle would get prices from the stores that we might want to deal with and submit them to me, and if they were satisfactory, the stock was ordered. I think we were dealing, perhaps, with most of the stores here, largely with the Jennison Hardware Company. Down to the spring of 1902 the general work of Mr. Ruttle was as I have stated. In May of 1902, I think it was, Mr. Ruttle acquired stock in the Wenona coal mine. The stock was sold to him in this manner: He was to give his note for $5,000, that was the amount of the stock at par, say for three months, and the note was taken by me and discounted at the bank, and he was to

pay the bank discount, and as dividends were declared by the Wenona Company, they would be applied on the note, and the note was reduced in that manner. He got $5,000 of stock, one-twentieth of the capital. I think he commenced to go out in the What Cheer field some time in 1902, I think somewhere about that time. He got his stock when he first commenced to go out in the field. There was no arrangement.

"*Q.* What did you tell him about the field?

"*A.* I told him that some of the leases were not satisfactory, and requested him to go out and see if he could get them modified and changed.

"*Q.* Was there anything said to him—

"*A.* At this time there was a strike on, and there was no work in any of the mines here.

"*Q.* Is this the year that the big coal strike was on, in the anthracite coal field?

"*A.* Yes, sir.

"*Q.* Were the mines operating here then?

"*A.* In my recollection they were not. My recollection is that there were several continuous months that the Wenona mine did not require Mr. Ruttle's attention on account of the strike. I told him some of these leases in the What Cheer field wanted to be changed, and I asked him to go out. I think I probably showed him the leases and gave them to him. At this time, May, 1902, there was nothing said about his having any interest of any kind in that field. There were a few leases that were changed. I do not know how much time he might have taken. I do not think it was any large amount of time. He never made any suggestion of any character when he started out in the What Cheer field that he was to make any charge or receive any compensation for his work. He would go out with a horse and buggy. I presume he would tell me when he came in what he had done; he did, as far as I recall. I determined that I would put a shaft down out there in the latter part of 1902 or early in 1903. Every employé spending money on my account or on account of the company would be required to keep an expense book. We had weekly expense books. It was some time in 1903 that I first had any talk with Mr. Ruttle about his acquiring any interest in the What Cheer field. I think at this time we had done a little further testing, and had secured changes in some of the leases.

"*Q.* What did you tell him about an interest in the What Cheer field?'

"*A.* I told him that I would give him a show—not give him, but sell him, the same amount of stock in the What Cheer company, when the company might be formed, when it was formed, that he had in the Wenona —that is, $5,000, to be paid for on the same plan that the Wenona stock was paid for.

"*Q.* Now, did you ever have any other or different arrangement with him in reference to any stock in the What Cheer mine or field other than you have here stated?

"*A.* No other.

"*Q.* Did you ever make any modification or change of any character in that arrangement?

"*A.* None, whatever.

"*Q.* Did you ever, down to the time that he announced his withdrawal from your staff, did you ever refuse to carry out that arrangement?

"*A.* No, sir.  *  *  *  I do not recall any definite conversation with Mr. Ruttle on the train going to Detroit on January 28th as testified by him with reference to stock in the What Cheer Company.

" *Q.* Will you state whether in this conversation you said to Mr. Ruttle anything to the effect that he should have ten or fifteen thousand dollars in the What Cheer Coal Mining Company?

"*A.* Not at this time, or at any other time.

" *Q.* Was there any talk this day on the train about the formation of the company?

"*A.* I think likely there was.

" *Q.* Was the amount of the capital stock discussed at that time?

"*A.* I don't recall whether I determined at that time what the capital stock would be.   I am not certain about that.

"*Q.* You did determine it later?

"*A.* I did determine it later.   I determined the amount of capital stock sometime in 1904, previous to the formation of the company.   My recollection is that it would be some time in 1904, previous to the formation of the company, that I first had any talk with Mr. Ruttle about the issuance of any stock to him in it.   I think it would be after January 28th.

"*Q.* You may state, and I do not think you have stated it, except inferentially, state just what the contract was in reference to the What Cheer stock?

"*A.* I agreed to sell to Mr. Ruttle $5,000 of the stock in the What Cheer Company on the same basis that he bought $5,000 of stock in the Wenona.

"*Q.* I think you have stated that.

"*A.* Yes; to be paid out of the profits, if any."

As to the work of the plaintiff in the Tuscola coal field, defendant testified:

"Mr. Ruttle never asked me at any time for any interest in the Tuscola field. He asked what I was going to do about the Tuscola field. That was in the talk on the dock. I told him that up to that time I had not found anything of moment, and I had spent something like ten or twelve thousand dollars, and it looked as though we might lose all the money we had in there. I hadn't anything to say about it. To the best of my recollection I had surrendered some of the leases at this time. If we found anything worth while in the Tuscola field, Mr. Ruttle would have an interest after I was reimbursed.

"I told Mr. Ruttle that he could go out in the Tuscola field and get leases, and that if I got my money back out of it that I put in it, I would let him have some interest in it, provided he stayed with me. He went on with that understanding. I told him I would give him an interest to encourage him. It was for our mutual benefit. I told him on the train going to Detroit that I would let him have $5,000 of the stock of the What Cheer Company. In the conversation had on the dock I told him he could have it if he stayed in my employ; it would be paid for in dividends that the company might make. He was to give his note at 6 per cent. interest. It was to be the same arrangement as in the Wenona mine. It was to be a bankable note; it would run three or four months, and be renewed as required, for the reduced amount. If there were no dividends from the mine, then we would not get anything for the stock, and the note would not have to be paid. It was the understanding that if no profits were made, he would not be required to pay for the stock; I would have to take up the note myself and pay it. This was the talk between us. The first talk about letting him have any stock in the What Cheer was some time before the company was organized."

The jury returned a general verdict for plaintiff, and also answered certain special questions submitted by the

court. The questions so submitted and the answers are:

"(1) Was there an agreement made between plaintiff and defendant before January 28, 1904, that plaintiff should be compensated for his work in the What Cheer field by an interest in the leases?

"The same was answered: No.

"(2) Was there an agreement made between plaintiff and defendant before January 28, 1904, that plaintiff should be compensated for his work in the What Cheer field by the payment of cash?

"The same was answered: No.

"(3) Was there an agreement made between plaintiff and defendant that plaintiff should render services in the Tuscola field for a quarter interest in the leases taken?

"The same was answered: No.

"(4) Was there an agreement made between plaintiff and defendant that plaintiff should render services in the Tuscola field for compensation to be paid in cash?

"The same was answered: No.

"(5) Do you find that defendant promised plaintiff $5,000 of the stock of the What Cheer Company?

"The same was answered: Yes, by sale."

In instructing the jury the court advised them that they should determine what the original contract of the parties was. If it was found to be as claimed by defendant, and no other or later contract or agreement was entered into, plaintiff could not recover. If there was an agreement that plaintiff was to receive compensation for services other than those originally contracted for, plaintiff could recover. This as to the so-called What Cheer coal field. If defendant agreed to give plaintiff a one-quarter interest in the leases secured in the Tuscola coal field, that would be an agreement for an interest in land which could not rest in parol. But, in such a case, if defendant did not carry out such agreement, plaintiff could recover the reasonable value of the services performed in that behalf. If, however, the arrangement was the one testified to by the defendant, the plaintiff could not recover. The jury was further instructed as follows:

"Now, gentlemen of the jury, I have stated to you that

the claim of the plaintiff is that those services were rendered under an express contract, by promise on Mr. Foss' part, to compensate him on the one hand, and give him an interest in this property on the other. That is what we call in law an 'express contract.' We have, however, a provision of law relative to payment for services concerning which there is no contract stated between the parties. If one man renders services to another under such circumstances as leads the man who renders the service to expect that he is going to get pay for them, and as leads the man for whom the services are rendered to expect he is going to pay the other man for them, that raises in law what we term an 'implied contract' upon the part of the one for whom the services are rendered to pay the other for them. That does not mean that a man cannot perform gratuitous services for another. Perhaps there is no year that each one of us sometimes during the year does some little act of kindness, some gratuitous service for some one, and you do not expect any compensation for it, and that one does not expect to give you any compensation for it. The law does not prevent people doing that, and it does not permit a man to recover for his services when they are rendered in that way. But when they are rendered under such circumstances as leads one man to believe he is going to be paid, and the other man to expect that he is going to pay for them, and even though there may be no positive promise to pay, yet the law permits a man to recover under such circumstances what the services were reasonably worth."

OSTRANDER, J. (*after stating the facts*). There are 33 assignments of error, some 25 or 26 of which are mentioned and to some extent relied upon in the brief for appellant. The first five relate to the effect upon the general verdict of the answers to the special questions. We have taken the pains to set out testimony given by plaintiff and by defendant with respect to the bargain or arrangement existing between them. The answers to the special questions in the light of this testimony have not all the significance which is claimed for them. The answer to the fifth question is precisely in keeping with the testimony of defendant, and precisely opposed to that of plaintiff.

This is true, also, of the answers to the third and fourth questions. But the answers to the first and second questions are not necessarily inconsistent with a general verdict for the value of services performed in the What Cheer coal field and described in the first item of the plaintiff's bill of particulars. They are consistent with plaintiff's testimony to the effect that he was to be "compensated, taken care of," but in just what manner there was no agreement. But they are also consistent with the testimony of defendant and with the theory of plaintiff's right to recover only upon an implied contract. Therefore, as affecting the general verdict, none of the answers have any considerable significance unless the jury awarded plaintiff something for his services in the Tuscola coal fields. It is clear, in view of these answers, they could not have done so and followed the instructions of the court, except upon the theory that plaintiff might recover, under an implied contract, for services in the Tuscola field. That he could not be permitted to do so is clear. The testimony expressly negatives the proposition. The special findings negative the agreement testified to by plaintiff. The only other arrangement testified to was by defendant. Both claim there was an express agreement.

We are of opinion, too, that plaintiff upon this record cannot be allowed to recover, as upon an implied contract, for services in the What Cheer coal field. There was some, though a very narrow, support for such a theory in the case of *Ruttle* v. *Mining Co.*, which has been referred to, in that plaintiff there admittedly rendered services for the corporation itself, after its organization. In the case ar bar, he was either working for the defendant, under the original contract of hiring, or else he was working under some new arrangement. Plaintiff testifies that there was a new or other arrangement, and states what it was—indefinite at first as to what should be paid him, but later on made certain and definite by an agreement to give him a large amount of the stock of the concern. Inferentially at least, the jury found his testimony to be un -

true, since they found he was promised, as defendant says he was, $5,000 only of the stock which was to be sold to him, and if the dividends paid were sufficient to pay for it, it was to be his without other cost to him. The express agreement testified to by the plaintiff is declared upon specially in his declaration, and the breach of the agreement, to his damage, is alleged. Under the testimony the case is not like *Van Fleet* v. *Van Fleet*, 50 Mich. 1 (14 N. W. 671), and other cases cited for the appellee, and is like, and is controlled by, the familiar rule stated and applied in *Swarthout* v. *Lucas*, 101 Mich. 609 (60 N. W. 306); *Shaw* v. *Armstrong*, 88 Mich. 311 (50 N. W. 248); *Schurr* v. *Savigny*, 85 Mich. 144 (48 N. W. 547). The error numbered 7 is well assigned.

There was some evidence of the value of plaintiff's services, and the court properly refused to direct a verdict upon the ground there was no such evidence. We do not find, upon examination of the record, that the court refused to permit defendant to show what would be fair compensation for plaintiff's services. He did refuse, and we think properly, to permit defendant to show what, in his judgment, he could have got others for, and to state that he hired a more competent man, whom he named, who was otherwise employed, at a certain salary. It is not disputed that defendant hired plaintiff originally at an agreed salary of $1,400, later increased to $2,000, per annum. This salary plaintiff continued to draw. What plaintiff claims is that, becoming proficient, he continued to earn that salary by the services originally contracted to be paid, and was also able to earn, and defendant employed him to earn, other compensation for other services.

It appears to be claimed, although the claim is not very clearly made, that the remedy of plaintiff is in an action for damages for breaches of the express oral agreements to which he testifies. If it is meant that, having been employed under an arrangement to have some compensation—to be taken care of—the manner and method being left to defendant, and defendant, having later indicated

the method to plaintiff's satisfaction, refused to carry it out, as he had the power, if not the right, to do, plaintiff is thereby debarred the action to recover what his services were worth, we do not agree with counsel. If it is assumed that compensation in some, but in an indefinite, form was promised, in consideration of which the services were performed; that defendant upon occasion stated to the satisfaction of plaintiff that compensation should be in the form of stock, in a corporation to be formed, and later, the corporation having been formed, refused all compensation—we know of no rule of law which would prevent plaintiff from recovering in money the reasonable value of his services. Whether a corporation should be organized depended upon defendant. Whether the offer of stock should be large or small depended upon defendant. Whether he should transfer any stock was a matter of his choice. The fact that he proposed to give a certain amount of stock, and plaintiff said he would accept it, if given, as his compensation, does not, the stock being refused, and all other compensation being refused, require plaintiff to forego compensation, as such, or deny him an action for its recovery.

Various assignments of error are based upon rulings admitting testimony over objections. We think it not necessary to notice them specifically. It is to be said generally that the real issues are narrow, and that testimony concerning the defendant's connection with the Wenona Coal & Mining Company, the salary he drew therefrom, the manner in which he acquired certain of its stock, especially that later transferred to plaintiff, is irrelevant. We regard the errors, eleventh to fifteenth, inclusive, well assigned. The same should be said of the testimony of plaintiff concerning the quantity of coal in the What Cheer field, and the seventeenth error is well assigned.

Reading the whole of the charge to the jury in connection with the requests to charge preferred by defendant

does not convince us that there was error therein, except as already indicated.

Other errors assigned are not considered, since it is not likely that for the purposes of a new trial their consideration is necessary.

The manner in which the record and the brief for appellant have been prepared calls for notice. The case is one in which compliance with Rule 40 of this court would be of especial benefit to the court. The questions presented and the errors relied upon are, for the most part, discoverable only in the course of reading a general discussion, which often precedes any reference whatever to the error alleged. The record contains more than 260 pages. There has been an apparent, but only an apparent, attempt made to reduce the testimony given to narrative form. It is interspersed with the colloquies of counsel, and of counsel and the court, which are without possible consequence to the errors relied upon. We are of opinion that the case for the appellant upon this appeal ought to have been presented in a record of 150 pages, and that his taxable costs should be so limited.

The judgment is reversed, and a new trial granted.

MONTGOMERY, C. J., and HOOKER, BLAIR, and STONE, JJ., concurred.